UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

CLUB RETRO, L.L.C., et al.,           CIVIL ACTION
          Plaintiffs                  NO. CV-07-0193-A

VERSUS                                JUDGE DEE D. DRELL


WILLIAM EARL HILTON, et al.,
          Defendants              MAGISTRATE JUDGE JAMES D. KIRK

_____REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

    Before the court is a civil rights complaint filed on February
2, 2007, pursuant to 42 U.S.C. § 1983 and including supplemental
state law claims, and amended on December 12, 2007 (Doc. Item 50),
by plaintiffs Club Retro, L.L.C. (a night club business in
Alexandria, Louisiana)("Club Retro"), Lyle K. Doublet (manager and
sixty percent owner of Club Retro, L.L.C.), Dar J. Doublet (forty
percent owner of Club Retro, L.L.C.), Erica Doublet (wife of Dar J.
Doublet), Erica Doublet on behalf of her minor daughter, Olivia
Lynn Marie Doublet, Christine A. Smith (former manager of Club
Retro) Christine A. Smith on behalf of her minor daughter, Carley
A. Smith, Ronnie M. Mabou (former disc jockey at Club Retro), and
Jonathan K. Frost (former head bartender at Club Retro).

    The named defendants are William Earl Hilton ("Hilton")
(individually and in his official capacity as (then) Sheriff of
Rapides Parish, Louisiana) and several Deputy Sheriffs of Rapides
Parish, both individually and in their official capacities: Michael

Slocum ("Slocum"), Ricky Doyle ("Doyle"), Michael LaCour ("LaCour"), James Rauls ("Rauls"), and John Does.

Plaintiffs contend that, due to defendants' racial bias, Club Retro was targeted and raided by defendants in "Operation Retro-Fit," cars parked at Club Retro were searched, plaintiffs were arrested, and plaintiffs' family relations were interfered with. Plaintiffs claim defendants made a warrantless search of Club Retro and it's owners, employees, and patrons in the early morning hours of February 5, 2006, in an attempt to find evidence of illegal narcotics and other criminal activity. For relief, plaintiffs ask for general and punitive damages, compensation for property damages, and attorney fees.

Defendants answered the complaints (Doc. Items 10-14, 53) and filed a motion to dismiss[1] (Doc. Items 22, 52), to which plaintiffs filed briefs in opposition (Doc. Item 34, 51). Defendants' motion to dismiss was referred to the undersigned Magistrate Judge for report and recommendation (Doc. Item 24).

<u>Law and Analysis</u>

<u>Motion to Dismiss and Qualified Immunity</u>

Defendants contend they are entitled to dismissal of plaintiffs' claims because plaintiffs failed to state a claim on

---

[1] Although evidence was submitted, the court did not consider it and has not converted this motion to a motion for summary judgment. However, the "Operation Retro-Fit" plan was considered since it was a part of the complaint.

which relief may be granted and because defendants are entitled to qualified immunity.

A motion to dismiss for failure to state a claim upon which relief can be granted is generally viewed with disfavor and rarely granted.  Tanglewood East Homeowners v. Charles-Thomas, Inc., 849 F.2d 1568, 1572 (5th.Cir. 1988); Doe v. U.S. Dept. of Justice, 753 F.2d 1092, 1101 (D.C.Cir. 1985).  For the purposes of such a motion, the factual allegations of the complaint must be taken as true, and any ambiguities must be resolved in favor of the pleader. Doe, 753 F.2d at 1101.  A motion to dismiss an action for failure to state a claim admits the facts alleged in the complaint, but challenges plaintiff's right to relief based upon those facts. Crowe v. Henry, 43 F.3d 198, 203 (5th Cir. 1995).  In particular, a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  Hirras v. National Railroad Passenger Corp., 10 F.3d 1142, 1144 (5th Cir. 1994), vacated on other grounds, 512 U.S. 1231, 114 S.Ct. 2732, 129 L.Ed.2d 855 (1994); Doe, 753 F.2d at 1102.  On a motion to dismiss, it is presumed that general allegations embrace the specific facts that are necessary to support the claim. National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 114 S.Ct. 798, 803, 127 L.Ed.2d 99 (1994), citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 2137, 119

L.Ed.2d 351 (1992).

The defense of qualified immunity protects a public official from both litigation and liability, absent a showing that the official violated a constitutional right that was clearly established at the time of the incident.  Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995), cert. den., 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996).  Qualified immunity cloaks a police officer from personal liability for discretionary acts which do not violate well established law.  Officers have qualified immunity if their actions could reasonably have been thought consistent with the right they are alleged to have violated.  Richardson v. Oldham, 12 F.3d 1373, 1380-81 (5th Cir. 1994), and cases cited therein. Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.  Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2515 (2002).

The defense of qualified immunity may be considered on a motion to dismiss.  In order to survive a motion to dismiss, a plaintiff's allegations must portray an objectively unreasonable violation of a clearly established right.  Shipp, 199 F.3d at 261.

The first inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation.  Hope, 122 S.Ct. at 2513.  If it is established that the defendants participated in

4

constitutionally impermissible conduct, the defendants may nevertheless be shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Hope, 122 S.Ct. at 2515. For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. In the light of pre-existing law, the unlawfulness must be apparent. However, officials can be on notice that their conduct violates established law even in novel factual circumstances. The salient question the court must ask is whether the state of the law at the time of the alleged incident gave the officers fair warning that their alleged conduct was unconstitutional. Hope, 122 S.Ct. at 2516.

The qualified immunity defense involves a shifting burden of proof. The defendant official must initially plead his food faith and establish that he was acting within the scope of his discretionary authority. Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law. The Fifth Circuit does not require that an official demonstrate that he did not violate clearly established federal rights; that burden is upon plaintiffs. If a plaintiff states a valid claim, the plaintiff bears the burden

of demonstrating the defendant's actions violated clearly established law. Salas v. Carpenter, 980 F.2d 299, 306 (5th Cir. 1992), and cases cited therein.

When a defendant raises the defense of qualified immunity, there is an array of procedures for the district court to follow. First, the district court must insist that a plaintiff suing a public official under Section 1983 file a short and plain statement of his complaint, a statement that rests on more than conclusions alone. Second, the court may, in its discretion, insist that a plaintiff file a reply tailored to an answer pleading the defense of qualified immunity. Vindicating the immunity doctrine will ordinarily require such a reply, and a district court's discretion not to do so is narrow indeed when greater detail might assist. The district court may ban discovery at this threshold pleading stage and may limit any necessary discovery to the defense of qualified immunity. The district court need not allow any discovery unless it finds that plaintiff has supported his claim with sufficient precision and factual specificity to raise a genuine issue as to the illegality of defendant's conduct at the time of the alleged acts. Even if such limited discovery is allowed, at its end, the court can again determine whether the case can proceed and consider any motions for summary judgment under Rule 56. Schultea v. Wood, 47 F.3d 1427, 1433-1434 (5th Cir. 1995).

In the case at bar, plaintiffs were permitted to file a

supplemental and amending complaint which provided additional facts, as well as a response to the motion to dismiss which addressed the qualified immunity defense.  Therefore, plaintiffs have been afforded opportunities to meet the heightened pleading requirement in this case.

<u>The Complaint</u>

Plaintiffs contend defendants violated their (1) Fourth Amendment right against unreasonable searches and seizures, (2) their Fourteenth Amendment right against the unreasonable use of force, and (3) their First Amendment rights to freedom of association and expression.  Plaintiffs further contend defendants (1) violated the First Amendment rights of Club Retro, Lyle Doublet, and Dar Double to provide a venue where live music is played to an audience of paying customers, (2) violated the 14th Amendment rights of Club Retro, Lyle Doublet, and Dar Doublet to engage in their business or occupation without interference from government officials, (3) violated all plaintiffs' Equal Protection right to have the laws applied to them in an equal fashion without regard to race or association, and (4) violated plaintiffs' right to be free from governmental conduct which interferes with their familial relationships.

Plaintiffs allege in their complaint that unnamed sheriff's deputies closed Club Retro before the closing time of 2:00 a.m. on January 21, 2006, and January 28, 2006.  Plaintiffs further allege

that, on Sunday, February 5, 2006, the Rapides Parish Sheriff's Office conducted "Operation Retro-Fit" at Club Retro (Doc. Item 1, Ex.).   Plaintiffs allege that, at about 12:15 a.m. on Sunday, February 5, 2006, a team of Rapides Parish Deputy Sheriffs, some in full SWAT gear including black ski masks, "crashed" in the front door of the club, ran in and arrested everyone there, shoved the bartenders and owners to the ground, and opened cash registers; as a result, the floor was covered with broken glass and one woman was trampled by the deputies.   Deputies held the club staff at gunpoint, handcuffed some, hit one man in the head with a rifle butt, and took the cash from the cash registers.   All club patrons under the age of 21 were separated from the others and patrons were allowed to leave after they were sniffed by a K-9 narcotics dog, physically searched, and had their names checked; women were required to lift their shirts and shake out their bras.   Some patrons were held by the deputies for four hours.   Many of the patrons' cars were searched in the club parking lot.   The 121 patrons under age 21 were given "citations" for being underage and present in an alcohol establishment.   The officers' entry and searches were warrantless.

Plaintiffs further allege that Erica and Lyle Doublet lived in an apartment on the premises of Club Retro with their four year old daughter, Olivia.   On February 4, 2006, Erica and Lyle left Olivia in the office at Club Retro with two thirteen year old baby-

sitters, one of whom was Carley A. Smith, daughter of Club Retro bartender Christine A. Smith.  When the sheriff's deputies raided Club Retro in the early morning hours of February 5, 2006, the deputies forced their way into the office, pinned Carley Smith to a wall, then took all three children into the bar area of the club, in the midst of the broken glass, guns, and police dogs, despite the fact that Olivia Doublet was bare-footed.  Plaintiffs allege the defendants placed the children on bar stools to photograph them, and told the press the children had been sitting in the bar. The children were then taken to a Louisiana Department of Social Services worker, who was present at the raid; plaintiffs allege that defendant Slocum told them the children were going to be taken away from them.  However, the social services worker refused to take the children.  Plaintiffs contend Slocum then arrested Erica, Lyle, and Dar Doublet for possession of firearms in a night club. Several handguns, owned by plaintiffs and their employees, were found stored in the club office.

Plaintiffs allege that Christine Smith, Carley Smith's mother and a bartender at Club Retro, was forced to the ground at gunpoint by an unnamed deputy and searched, held for some time, then later allowed to leave with the three children.

Plaintiffs allege that Jonathan Frost, a bartender at Club Retro, was chased, thrown to the ground, stepped on by an officer after he held his hands up in surrender, and had a 9mm pistol

pressed up against his neck.

Finally, plaintiffs contend that Louisiana Ninth Judicial District Judge John C. Davidson had accompanied the officer during the raid on Club Retro and signed the arrest warrants for the Doublets following the searches.  Plaintiffs allege the affidavits attached to the warrants were prepared before the raid.

Plaintiffs Dar and Lyle Doublet were charged with keeping the nightclub open on January 4, 27, and 28, 2006 after 2 a.m. in violation of La.R.S. 33:1236 and Rapides Parish Ordinance 4-3(a)(3)(a).  Plaintiffs contend the club was not serving alcohol after 2 a.m., and further argue the ordinance is not valid because it was not approved by voters pursuant to La.R.S. 51:191. Plaintiffs contend the arrest warrants were invalid and their arrests were warrantless, unconstitutional, and in violation of La.R.S. 51:191.  Plaintiffs further allege that, although charges were brought against them, they were never prosecuted, and they successfully petitioned the court for the return of their firearms.

Plaintiffs further allege that both Dar and Lyle Doublet were charged with "generic charge - charge later," "firearm possession/bar," and "failure comply fire marshal."  Although the Fire Marshall estimated there were 822 people in the club at the time of the raid, defendant Rauls told the press there were 1000 people in the club; plaintiffs contend there were only about 500 people present.  During the raid, the Louisiana Office of Alcohol

and Tobacco Control ("LaATC") videoed the counting of the money in the cash registers.  Plaintiffs contend that video shows the amount of money paid for entry fees, which indicates there were no more than 500 people in the club.  Finally, plaintiffs show  La.R.S. 14:95.5 makes it legal for club owners to possess a firearm in a night club.  Thus, Plaintiffs contend the Doublets' arrests were unconstitutional.

Erica Doublet was charged with "improper supervision of a minor" under La.R.S. 14:92.2 and possession of a firearm in a bar. Plaintiffs contend Erica Doublet did not commit any of the activities set forth in La.R.S. 14:92.2, and that it was legal for her to possess a firearm in the bar, under La.R.S. 14:95.5.

Plaintiffs also allege that deputies wearing ski masks pointed an AR-15 semi-automatic machine gun at the Club Retro disc jockey, Matt Mabou, ordered Mabou to turn off the sound and turn on the house lights, and held him there until 5:00 a.m.

Plaintiffs allege Sheriff Hilton authorized Operation Retro-Fit and that it was planned and conducted pursuant to his policies and customs.

Plaintiffs further allege that defendants Slocum, Doyle, LaCour, and Rauls physically participated in Operation Retro-Fit, and that their activities were recorded by the club's video recorder monitoring system.  Plaintiffs contend Slocum was in charge of and participated in the raid, obtained arrest warrants

for Dar and Lyle Doublet and ordered the warrantless arrest of Erica Doublet, and threatened Erica Doublet.  Plaintiffs contend Doyle (who was one of the wardens at the Rapides Parish Detention Center) assisted in supervising the raid, actively participated in the arrests, booking, and bond setting for the Doublets, was in charge of booking the Doublets into the detention center, and personally charged Dar and Lyle Doublet with "generic charge - CHGE later."  Plaintiffs contend LaCour assisted in planning Operation Retro-Fit, participated in the raid, and assisted in obtaining the search warrant for Club Retro on February 8, resulting in the re-arrest of Dar and Lyle Doublet on some of the same false allegations of February 5, 2006, none of which involved illegal narcotics.  Plaintiffs allege Rauls assisted in planning Operation Retro-Fit, participated in the raid, and assisted in obtaining the search warrant for February 8, 2006.

<u>Law as to Official Capacity Claims</u>

Plaintiffs are suing the defendants in both their individual and official capacities.  The named defendants are the Sheriff of Rapides Parish and deputies employed by the Sheriff.

A deputy sheriff is an appointed public officer of his parish law enforcement district, of which the sheriff is the head. La.R.S. 33:1433, 33:9001.  Also, <u>Lewis v. Jefferson Parish Sheriff's Office</u>, 01-257 (La. App. 5th Cir. 9/25/01), 798 So.2d 249, 251; <u>City of Shreveport v. Caddo Parish</u>, 27,519 (La.App. 2

12

Cir. 6/23/95), 658 So.2d 786, 794-795.  La. R.S. 33:9001, et seq.,
empower the sheriff to raise revenues to finance his facilities and
services through the creation of a continuing legal entity in each
parish known as a law enforcement district, whose corporate
existence survives the term of office of any individual sheriff.[2]
Prator v. Caddo Parish, 38,085 (La. App. 2 Cir. 1/28/04), 865 So.2d
932, 936.

Therefore, a suit against Sheriff Hilton and the named deputy
sheriffs in their official capacities is actually a suit against
the Rapides Parish Law Enforcement District.  Law Enforcement
District of Parish of Avoyelles v. Avoyelles Parish Police Jury,

---

[2] La.R.S. 33:9001 states:
"There is hereby created, in each parish except Orleans, a
special district to be known as a law enforcement district for
the purpose of providing financing to the office of sheriff for
that parish. In the parish of Orleans such a special district is
hereby created for the purpose of providing financing to the
office of criminal sheriff. The provisions of R.S. 33:9002,
9003(D), 9007, 9008, and 9010 shall apply to the district created
in the parish of Orleans. No other provisions of this Chapter
shall be applicable thereto. The boundaries of each district
shall be coterminous with the boundaries of the parish and the
duly elected sheriff of the parish or in the parish of Orleans,
the criminal sheriff or his successor shall be ex officio the
chief executive officer of the district."
As plaintiffs point out in their supplemental and amending
complaint, a new sheriff has been elected for Rapides parish.
That will not affect the official capacity suit against Sheriff
Hilton since a successor sheriff may be held liable in his
official capacity for the torts for which his predecessor in
office was liable in his official capacity.  Riley v. Evangeline
Parish Sheriff's Office, 94-0202 (La. 4/4/94), 637 So.2d 395,
citing Jenkins v. Jefferson Parish Sheriff's Office, 402 So.2d
669, 671 (La. 1981).  Also, Burge v. Parish of St. Tammany, 187
F.3d 452, 470 (5th Cir. 1999).

98-996 (La. App. 3d Cir. 2/3/99), 736 So.2d 842, writ den., 99-635
(La. 4/23/99), 742 So.2d 892.

A plaintiff seeking to impose liability on a municipality
under Section 1983 is required to identify a municipal "policy" or
"custom" that caused the plaintiff's injury.  Locating a "policy"
ensures that a municipality is held liable only for those
deprivations resulting from the decisions of its duly constituted
legislative body or of those officials whose acts may fairly be
said to be those of the municipality.  <u>Board of Cty. Comm'rs of
Bryan Cty. v. Brown</u>, 520 U.S. 397, 403-404, 117 S.Ct. 1382, 1388
(1997).

In <u>Burge v. Parish of St. Tammany</u>, 187 F.3d 452, 470 (5th Cir.
1999), the Fifth Circuit explained that the official policy
requirement may be met in at least three different ways: (1) when
the appropriate officer or entity promulgates a generally
applicable statement of policy and the subsequent act complained of
is simply an implementation of that policy, (2) where no official
policy was announced or promulgated but the action of the
policymaker itself violated a constitutional right; and (3) even
when the policymaker fails to act affirmatively at all, if the need
to take some action to control the agents of the local governmental
entity is so obvious, and the inadequacy of existing practice so
likely to result in the violation of constitutional rights, that
the policymaker can reasonably be said to have been deliberately

indifferent to the need.  Burge, 187 F.3d at 471, and cases cited therein.   A custom or practice amounting to policy is demonstrated through proving a persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority. Johnson v. Deep East Tex. Regional Narcotics Trafficking Task Force, 379 F.3d 293, 309 (5th Cir. 2004).

Municipal liability under Section 1983 attaches where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.  Therefore, municipal liability may attach to a *single decision* to take unlawful action made by a municipal policymaker. Pembauer v. City of Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300 (1986).  Also, Bd. of Cty. Comm'rs of Bryan County v. Brown, 520 U.S. 397, 117 S.Ct. 1382 (1997); Burge, 187 F.3d at 470-471. Where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken *only once* or to be taken repeatedly.  Pembauer, 475 U.S. at 481, 106 S.Ct. at 1299.

15

For a municipality to be liable on account of its policy, the plaintiff must show, among other things, either (1) that the policy itself violated federal law or authorized or directed the deprivation of federal rights, or (2) that the policy was adopted or maintained by the municipality's policymakers with deliberate indifference as to its known or obvious consequences.  A showing of simple or even heightened negligence will not suffice.  <u>Johnson</u>, 379 F.3d at 309.

Under Louisiana law, the sheriff is a final policymaker. <u>Craig v. St. Martin Parish Sheriff</u>, 861 F.Supp. 1290, 1300 (W.D.La. 1994), citing La. Const. Art. 5, § 27 ("[The sheriff] shall be the chief law enforcement officer in the parish.").  Also, <u>McNeese v. State of Louisiana</u>, 2006 WL 1751055 (W.D.La. 2006).  As the chief executive officer for the Rapides Parish Law Enforcement District, the Rapides Parish Sheriff is the independent and final official policymaker for all of the law enforcement district.  A deputy sheriff is an appointed public officer of his parish law enforcement district, of which the sheriff is the head.  La.R.S. 33:1433, 33:9001.  Also, <u>Lewis v. Jefferson Parish Sheriff's Office</u>, 01-257 (La. App. 5th Cir. 9/25/01), 798 So.2d 249, 251. Since deputy sheriffs are not policymakers for the Rapides Parish Sheriff and the Rapides Parish Law Enforcement District, the claims against Deputies Slocum, Doyle, LaCour and Rauls in their official capacities should be dismissed.

16

Municipal liability under Section 1983 attaches where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. Therefore, municipal liability may attach to a *single decision* to take unlawful action made by a municipal policymaker. Pembauer v. City of Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300 (1986). Also, Bd. of Cty. Comm'rs of Bryan County v. Brown, 520 U.S. 397, 117 S.Ct. 1382 (1997); Gelin v. Housing Authority of New Orleans, 456 F.3d 525, 527 (5th Cir. 2006). Where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken *only once* or to be taken repeatedly. Pembauer, 475 U.S. at 481, 106 S.Ct. at 1299.

The plaintiff must also show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights. Accordingly, proof that a municipality's *authorized decision maker* has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Board of Cty. Comm'rs of Bryan Cty., 520 U.S. at 404, 117 S.Ct. at 1388-90.

A suit brought against a defendant in his official capacity is, effectively, a suit against the governmental unit that employs

the defendant.  <u>Monell v. Dept. of Social Services</u>, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978); <u>Brooks v. George County, Ms.</u>, 84 F.3d 157, 165 (5th Cir. 1996), cert. den., 519 U.S. 948, 117 S.Ct. 359 (1996).  Since the Rapides Parish Law Enforcement District is not entitled to qualified immunity, <u>Owen v. City of Independence, Mo.</u>, 445 U.S. 622, 650, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980), neither is Sheriff Hilton in his official capacity, <u>Rodgers v. Jabe</u>, 43 F.3d 1082, 1089 (6th Cir. 1995); <u>Ruehman v. Sheahan</u>, 34 F.3d 525, 527 (7th Cir. 1994).

Therefore, as previously stated, the claims against Deputies Locum, Doyle, LaCour, and Rauls in their official capacities should be dismissed.  The claims against Sheriff Hilton in his official capacity are discussed under separate topics below.

<u>Sheriff Hilton in his Individual Capacity</u>

As to the claims against Sheriff Hilton, defendants contend the doctrine of respondeat superior, which makes an employer or supervisor liable for an employee's alleged tort, is unavailable in suits under 42 U.S.C. §1983.  <u>Thompkins v. Belt</u>, 828 F.2d 298, 303 (5th Cir. 1987).  Well settled §1983 jurisprudence establishes that supervisory officials cannot be held vicariously liable for their subordinates actions.  Supervisory officials may be held liable only if: (1) they affirmatively participate in acts that cause constitutional deprivation; or (2) implement unconstitutional policies that causally result in plaintiff's injury.  <u>Mouille v.</u>

City of Live Oak, Tex., 977 F.2d 924, 929 (5th Cir. 1992), cert.
den., 508 U.S. 951, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993);
Thompkins, 828 F.2d at 303.

Plaintiffs allege personal involvement by Sheriff Hilton
through authorizing the raid and by alleging an unconstitutional
policy or custom promulgated or implemented by Sheriff Hilton, as
discussed below; plaintiffs do not appear to be relying on
supervisory liability.  Each claim against Sheriff Hilton is
discussed below.

Fourth Amendment Claims

First, defendants contend plaintiffs failed to state a claim
under the Fourth Amendment for violation of their Fourth Amendment
rights for (1) their entry into Club Retro, (2) the investigatory
stops/pat downs, (3) the arrests, (4) the searches, (5) the use of
excessive force, and (6) rudeness causing mental anguish and
emotional distress.

Defendants argue plaintiffs failed to state a Fourth Amendment
claim for the warrantless entry and search of Club Retro because
they did not have a reasonable, legitimate expectation of privacy
in Club Retro.  Defendants further claim the warrantless search of
Club Retro and those within it was authorized by law.

The Fourth Amendment's prohibition on unreasonable searches
and seizures is applicable to commercial premises, as well as to
private homes.  An owner or operator of a business thus has an

19

expectation of privacy in commercial property, which society is prepared to consider to be reasonable.  This expectation exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes. An expectation of privacy in commercial premises, however, is different from, and less than, a similar expectation in an individual's home.  This expectation is particularly attenuated in commercial property employed in closely regulated industries. Certain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise.  New York v. Burger, 482 U.S. 691, 700, 107 S.Ct. 2636, 2642 (1987), and cases cited therein. The liquor industry has long been subject to close supervision and inspection.   Burger, 482 U.S. at 700, 107 S.Ct. at 2642-2643, citing Colonnade Corp. v. U.S., 397 U.S. 72, 90 S.Ct. 774 (1970), and U.S. v. Biswell, 406 U.S. 311, 92 S.Ct. 1593 (1972).  The Colonnade-Biswell doctrine states that an owner of a closely regulated industry has a reduced expectation of privacy.  The doctrine is essentially defined by the pervasiveness and regularity of the federal regulation and the effect of such regulation upon an owner's expectation of privacy.  Burger, 482 U.S. at 700, 107 S.Ct. at 2643.

Because the owner of operator of commercial premises in a

closely regulated industry has a reduced expectation of privacy, the warrant and probable cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, have lessened application in this context. Where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment. Donovan v. Dewey, 452 U.S. 594, 602, 101 S.Ct. 2534, 2643-2644 (1981), and cases cited therein.

A warrantless inspection, however, even in the context of a pervasively regulated business, will be deemed to be reasonable only so long as three criteria are met.  First, there must be a substantial government interest which is the basis for the regulatory scheme pursuant to which the inspection is made. Second, the warrantless inspections must be necessary to further the regulatory scheme.  Third, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.  In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.  To perform this first function, the statute

must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.  In addition, in defining how a statue limits the discretion of the inspectors, it must be carefully limited in time, place, and scope.  <u>Beck v. Texas State Bd. of Dental Examiners</u>, 204 F.3d 629, 638 (5th Cir. 2000), cert. den., 531 U.S. 871, 121 S.Ct. 171 (2000), citing <u>New York v. Burger</u>, 482 U.S. 691, 702-703, 107 S.Ct. 2636, 2644 (1987).  In other words, the third criteria ensures the inspection is carried out in a reasonable manner.

The greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home, and that this privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections.  <u>Biswell</u>, 406 U.S. at 316, 92 S.Ct. at 1596.

Inspections of commercial property may be unreasonable if they are not authorized by law or are unnecessary for the furtherance of federal interests.  <u>Colonnade Catering Corp.,</u> 397 U.S. at 77, 90 S.Ct. at 777.  Similarly, warrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all

practical purposes, has no real expectation that his property will from time to time be inspected by government officials. <u>Marshall</u>, 436 U.S. at 323, 98 S.Ct. at 1826.   Where Congress (or other legislative body) has authorized inspection but made no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply. <u>Colonnade Catering Corp.</u>, 397 U.S. at 77, 90 S.Ct. at 777.  In such cases, a warrant may be necessary to protect the owner from the "unbridled discretion [of] executive and administrative officers," <u>Marshall</u>, 436 U.S. at 323, 98 S.Ct. at 1826, by assuring him that reasonable legislative or administrative standards for conducting an...inspection are satisfied with respect to a particular [establishment]." <u>Camara v. Municipal Court</u>, 387 U.S. 523, 538, 87 S.Ct. 1727, 1735 (1967).

However, administrative searches conducted pursuant to valid statutory schemes do not violate the constitution simply because of the existence of a specific suspicion of wrongdoing. <u>Beck</u>, 204 F.3d at 639.  An administrative inspection of a closely regulated business is a well-established exception to the warrant requirement for a search.  <u>Crosby v. Paulk</u>, 187 F.3d 1339 (11th Cir. 1999), citing <u>Burger</u>, 482 U.S. at 712, 102 S.Ct. at 2649.

The Eleventh Circuit has reviewed two cases involving alleged administrative searches and inspections of night clubs.  In <u>Crosby</u>, the Eleventh Circuit upheld an administrative warrantless two-hour

23

search of a nightclub where an agent of the Georgia Department of Revenue, with the aid of forty law enforcement officers and accompanied by local news media, executed valid, previously obtained arrest warrants for the owners of the bar, checked the identifications of the approximately 400 patrons (many of whom were underage college students) for underage sales of alcohol, and searched for violations of the Georgia laws relating to alcohol sales.  In Crosby, the commercial premises were secured but no weapons were ever drawn, no one was threatened, and the patrons were not physically touched and were allowed to leave after their identification was checked, all within two hours.  The officers stopped the band music, ordered the house lights to be illuminated, told the bartenders to stop serving alcohol, ordered the patrons to remain where they were, and instructed people on the dance floor to sit on the floor and not return to their tables.  The owner was asked to open his office and produce credit card receipts so the agent could ascertain if there was evidence of after-hours sales of alcohol.  Finally, the court found that the number of officers present was reasonable in light of the expectation that 500 to 700 patrons would be present during the administrative search.  The court noted that inspection of patrons' identifications may occur in the context of a valid, warrantless administrative search, where a business owner is on notice that the business would be subject to inspection pursuant to the state administrative scheme.  Crosby,

24

187 F.3d at 1351, citing Illinois v. Krull, 480 U.S. 340, 359, 107 S.Ct. 1160, 1172 (1987).

The Eleventh Circuit found a sharp contrast to Crosby in the case of Swint v. City of Wadley, 51 F.3d 988, 992-993 (11th Cir. 1995), involving two administrative searches of a nightclub which were held to be unreasonably excessive in their execution. The court found the two raids, conducted by 30 to 40 officers with the aid of SWAT team officers (some wearing ski masks), during which officers pointed their weapons at club employees and patrons, searched and detained employees and patrons until the 1 ½ hour raids were over, and refused permission to go to the restroom, were unreasonable.  The Court stated the massive show of force and excessive intrusion evidenced in the raids was in marked contrast to other administrative inspections of the club and that no reasonable officer in the defendants' position could have believed they were lawful, warrantless administrative searches.

Likewise, in Bruce v. Beary, 498 F.3d 1232, 1242 (11th Cir. 2007), the Eleventh Circuit found troubling the officers' execution of the administrative inspection of an auto body shop.  The Court noted the statutes authorizing the administrative inspection did not authorize the use of a SWAT team, the search and prolonged detention of employees, pat downs of the employees, or for officers to arrive with guns drawn.  The administrative inspection was conducted by 20 officers over a period of eight hours, the officers

arrived in unmarked vehicles, surrounded the property and blocked the exits with their vehicles, entered the office with automatic shotguns and sidearms drawn, and searched and detained employees. The Court found the administrative inspection in Bruce to be more akin to a criminal raid, and held the execution of the administrative inspection was not reasonable and that the officers had exceeded the scope of an administrative inspection.

The Sixth Circuit dealt with a similar situation in Russo v. Massullo, 927 F.2d 605 (6th Cir.), cert. den., 502 U.S. 829, 112 S.Ct. 80 (1991).   In Russo, in order to serve notices of noncompliance with state liquor laws and to seize two illegal gambling machines, without a warrant, seven to ten officers entered a restaurant/lounge with guns drawn, pointed their weapons at the persons inside, and ordered everyone in the establishment to raise their hands over their heads.  Everyone was subjected to a pat-down search, then allowed to leave after they were searched.  The owner and an employee had their purses searched and neither were allowed to go to the restroom without being accompanied by a female officer.  The raid lasted two hours. The Sixth Circuit noted that, since the liquor industry is a pervasively regulated industry, a legislative body can provide for a warrantless administrative inspection of liquor establishments.  However, the court noted that, where there are no rules governing the procedure that inspectors must follow, the Fourth Amendment and its restrictive

rules apply.  <u>Russo</u>, 928 F.2d at *4, citing <u>Colonnade Catering</u>, 397 U.S. at 77, 90 S.Ct. at 777.  The authority to search a tavern does not give accompanying authority to search persons inside the tavern absent a reasonable belief that the particular person searched was involved in criminal activity or was dangerous.  <u>Russo</u>, 927 F.2d at *4, citing <u>Ybarra v. Illinois</u>, 444 U.S. 85, 92-94, 100 S.Ct. 338, 343-344 (1979).  The test for the entry itself and all subsequent conduct is whether they were reasonable.  <u>Russo</u>, 927 F.2d at *4, citing <u>Duncan v. Barnes</u>, 592 F.2d 1336, 1338 (5th Cir. 1979).  The court held the officers exceeded the scope of an administrative search.

In the case at bar, it is clear that the law as to the proper scope and conduct of an administrative search, as well as the law concerning the Fourth Amendment, were well established by the United States Supreme Court long before the incident in February 2006.  Therefore, the court must determine whether defendants' conduct, as alleged by plaintiffs, was objectively unreasonable in light of clearly established law.

Defendants do not contend they had probable cause to conduct a raid for illegal narcotics.  Instead, they rely on the laws regulating taverns and the sale of alcohol to justify what they argue was an administrative search of Club Retro and it's owners, employees and patrons.  Defendants also contend they had a right to enter Club Retro without a warrant in order to enforce the state

Fire Marshal's order concerning maximum capacity for the night club and to make an administrative search under the state liquor licensing laws.

Plaintiffs complain of the method of defendants' entry, crashing through the doors with guns drawn and pointed at the people within the club, the manner in which the search was carried out, and the scope of the search.

As in the cases discussed above, the manner in which the search was carried out at Club Retro was unreasonable, while the search itself far exceeded the scope of an administrative search. An administrative search would have involved only a search of receipts and office records for illegal alcohol sales (after hours or to underage minors), as well as checking identifications for underage patrons. However, the defendants admit they were looking for drugs, and their plan for the raid (labeled "Operation Retro-Fit") specifies that the narcotics search was a primary objective of the "mission" (See Doc. 1, Ex.; Doc. 22, Ex.). Plaintiffs allege the defendants searched everyone, without individualized reasonable suspicion or probable cause to believe they were in possession of a weapon or engaging in illegal activity, and that the searches exceeded mere pat downs for weapons, since the women were required to lift their blouses and pull their bras away from their bodies, in the hope that any drugs stashed there would fall out.

28

Where an individual is searched during the execution of a premises warrant, but is not named as a suspect in the warrant and is not under arrest, the police must have either individualized, articulable reasonable suspicion to frisk the individual or probable cause to search him. Williams v. Kaufman Cty., 352 F.3d 994 1004 (5th Cir. 2003). A pat-down search of a suspect, as authorized in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968), is an exception to the probable cause requirement which allows police officers to protect themselves by conducting a pat-down of a suspect for weapons only when the officer has a reasonable belief or suspicion, directed at the person to be frisked, that the person is in possession of weapons. Mere propinquity to others independently suspected of criminal activity is not, by itself, sufficient to establish reasonable suspicion of possession of a weapon. Moreover, the search is only for weapons, not drugs. Williams, 352 F.3d at 1004, and cases cited therein.

Defendants next contend plaintiffs have failed to state a Fourth Amendment claim based on their investigatory "pat-downs" of the employees and patrons at Club Retro. Defendants claim they had reasonable suspicion to do so based on complaints received from the community.

In Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338 (1979), the Illinois Bureau of Investigation obtained a search warrant authorizing the search of the Aurora Tap Tavern and the person of

the bartender.  During the search, one officer proceeded to pat down each of the nine to thirteen customers in the tavern. In the course of the pat down of patron Ventura Ybarra, heroin was found. The Supreme Court reversed the Ybarra's resulting conviction on Fourth Amendment grounds, stating that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Ybarra, 444 U.S. at 91, 100 S.Ct. at 342.  The Court further stated that the Fourth Amendment affords individualized protection:

> "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the 'legitimate expectations of privacy' of persons, not places."

See also, Williams v. Kaufman Cty., 352 F.3d 994 (5th Cir. 2003)(execution by forty officers of arrest warrant for five named individuals, in a nightclub, where deputies detained and strip searched 100 other people without individualized reasonable suspicion or probable cause, because they were in the nightclub at the time of the raid, violated their constitutional rights and awards of punitive damages were upheld).

Although the pat-down searches of the nightclub patrons for

weapons was authorized by La.R.S. 14:95.5,[3] that statute also specifically provides that owners and employees of a night club may possess firearms on the premises.  Therefore, as discussed above, the defendants must have individualized articulable reasons to suspect each owner and employee searched for weapons.  Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968).  Defendants have not presented any individualized reasons why they searched the owners and employees for weapons.  Since La.R.S. 14:95.5 specifically provides that tavern owners and employees are permitted to possess firearms in a tavern,[4] plaintiffs have stated another basis for their claim of violation their Fourth Amendment right against

---

[3] Although bar owners cannot directly complain that their patrons' Fourth Amendment rights were violated, they may complain when such violation causes the owners direct harm, such as unreasonable interference with business.  Mendoza v. I.N.S., 559 F.Supp. 842 (D.C.Tex. 1982).

[4] La.R.S. 14:95.5, Possession of firearm on premises of alcoholic beverage outlet, states:
    A. No person shall intentionally possess a firearm while on the premises of an alcoholic beverage outlet.
    B. "Alcoholic beverage outlet" as used herein means any commercial establishment in which alcoholic beverages of either high or low alcoholic content are sold in individual servings for consumption on the premises, whether or not such sales are a primary or incidental purpose of the business of the establishment.
    C. The provisions of this Section shall not apply to the owner or lessee of an alcoholic beverage outlet, or to an employee of such owner or lessee, or to a law enforcement officer or other person vested with law enforcement authority acting in the performance of his official duties.
    D. Whoever violates the provisions of this Section shall be fined not more than five hundred dollars or imprisoned for not more than six months, or both.

unreasonable searches.

Moreover, pat down searches are for weapons only; they are not for drugs. In Minnesota v. Dickerson, 508 U.S. 366, 113 S.Ct. 2130 (1993), the Supreme Court explained that, when an officer is justified in believing the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, the officer may conduct a pat down search to determine whether the person is in fact carrying a weapon. The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. A protective search-permitted without a warrant and on the basis of reasonable suspicion less than probable cause-must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby. If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry v. Ohio. The Dickerson court further explained that officers may seize non-threatening contraband detected during a protective pat down search so long as the search stays within the bounds marked by Terry v. Ohio, for example, if the contraband is within  plain view and its incriminating character is immediately apparent, or if during a pat down an officer feels an object whose contour or mass makes its identity immediately apparent, and the object is contraband, it may be seized without a warrant. Also,

<u>U.S. v. Ponce</u>, 8 F.3d 989, 999 (5th Cir. 1993).  In the case at bar, defendants have not provided an exception to the warrant requirement to justify the searches of the owners and employees for drugs.

Finally, where bar patrons are forcibly detained, and not permitted to leave for an extended period of time, in order for officers to investigate possible violations of law, there is a seizure of the patrons, rather than a detention.  See <u>Mendoza v. I.N.S.</u>, 559 F.Supp. 842, 846 (D.C.Tex. 1982).

Defendants claim plaintiffs are responsible for all searches at Club Retro because they brought three minor children into Club Retro.  However, the presence of minors does not appear to be related to the search for illegal narcotics.  Moreover, defendants did not have any reason to believe there were minor children there until they forced open the door to the private office and discovered the children, and it is questionable, to say the least, whether the presence of the children in the private office area, locked away from the night club itself, constitutes the illegal presence of minors in the night club.

Defendants argue they conducted an administrative search for which a warrant was not required.  Defendants cite La.R.S. 26:370, which provides the "secretary" may examine, at all reasonable hours, the books, records, and other documents relating to shipping or handling alcoholic beverages.  It is noted, however, that the

hours between midnight and 4:00 a.m. may not ordinarily be considered reasonable hours to examine books and records relating to alcohol sales.

Rapides Parish Ordinance Sec. 4-27, relating to regulation of the alcoholic beverage business, grants the Rapides Parish Sheriff "the power and authority to search and examine any place in which he believes a violation of this article is being committed; provided, that no house, room or apartment used as, or which is apparently is, a bona fide residence shall be subject to invasion and search except by an officer designated in a search warrant..." Ordinance Sec. 4-28 gives the sheriff the right to search and examine places of business storage, and to seize beverages to be held for evidence and the payment of permit fees. Defendants also contend the Fire Marshal had a right to inspect the premises pursuant to La.R.S. 40:1575, and that La. R.S. 40:1591 provides that law enforcement officers "shall enforce the orders of the fire marshal," a violation of the Fire Marshal's order as to maximum capacity constitutes a misdemeanor offense. However, the first stated objective of "Operation Retro-Fit" was to "[i]dentify the club owner and bartender selling illegal narcotics in the club"; use of the SWAT team and K-9 officers were not necessary for an administrative search for illegal alcoholic beverage sales.

Plaintiffs also complain that defendants broke open the office door. In <u>Colonnade Catering Corp. v. U.S.</u>, 397 U.S. 72, 90 S.Ct.

774 (1970), the Supreme Court dealt with issues concerning the statutory authorization for warrantless inspections of federally licensed dealers in alcoholic beverages.  The court specifically disapproved the federal inspectors' forcible entry of a locked storeroom, finding that Congress had not expressly provided for forcible entry in the absence of a warrant and had instead given government agents a remedy by making it a criminal offense to refuse admission to the inspectors.  The Supreme Court emphasized this Nation's traditions that are strongly opposed to using force without definite authority to break down doors, even in the liquor industry.  Also, U.S. v. Ibarra, 965 F.2d 1354, 1358 (5th Cir. 1992).  The general rule laid down in See v. City of Seattle, 387 U.S. 541, 545, 87 S.Ct. 1737, 1741 (1967), is that administrative entry, without consent, upon the portions of commercial premises which are not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure.

Since defendants purportedly were only conducting an administrative search and had no probable cause to believe a crime was being committed by any persons in Club Retro, defendants' warrantless and dramatic entry into Club Retro was not the type of entry contemplated under the statutes for an administrative search, and their forcible entry into the private office area of Club Retro was not justified.  Therefore, to the extent defendants are

attempting to re-characterize their warrantless searches for narcotics as an administrative search for illegal alcohol sales, that argument is unavailing to exempt defendants from the requirements of the Fourth Amendment.

Accepting plaintiffs' allegations as true for purposes of this motion, the scope of the search of Club Retro far exceeded that of an administrative search in several respects: entry of the premises by forty officers with some or all guns drawn - some in SWAT gear and some with ski masks on their faces, the use of force to break into the office area (instead of asking the owner to unlock the door), the "pat-down" searches of the owners, employees, and bar patrons for illegal drugs, the pat-downs or searches of the owners and employees for weapons, pointing guns at the owners and employees, the vehicle searches, the detention of everyone in the nightclub for up to four hours, and refusing to allow anyone to go to the bathroom.  Therefore, since the named defendants participated in the planning and supervising of Operation Retro-Fit, as well as participating in it, plaintiffs have stated claims against all defendants in their individual capacities.

Plaintiffs' allegation that Sheriff Hilton authorized and approved Operation Retro-Fit is an adequate allegation of Sheriff Hilton's personal involvement to support their claim against him in his individual capacity.  Finally, since reasonable officers would have been aware that the searches far exceeded the scope of an

administrative search or pat-down (<u>Terry</u>) searches, and that a warrant was necessary for a search for illegal drugs or weapons, the defendants' actions are objectively unreasonable and they are not entitled to qualified immunity in their individual capacities on the Fourth Amendment claims.

Plaintiffs also allege defendants are liable to them in their official capacities on the Fourth Amendment claims.  Plaintiffs contend Sheriff Hilton authorized Operation Retro-Fit and that it was conducted in accordance with "the policy and custom" of Sheriff Hilton and Deputies Slocum, Doyle, LaCour, and Rauls.  Of course, as discussed above, the deputies do not establish policy for the Rapides Parish Law Enforcement District.  Therefore, plaintiffs have not stated a claims against the deputies in their official capacities for violations of their Fourth Amendment rights.

However, plaintiffs' claim that Sheriff Hilton's decision, as a municipal policymaker, to take unlawful action against them by conducting a warrantless drug raid is sufficient to state a claim against Sheriff Hilton in his official capacity. See <u>Pembauer</u>, 475 U.S. at 481, 106 S.Ct. at 1299 ("Where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken *only once* or to be taken repeatedly.").  Therefore, accepting plaintiffs' allegations as true for purposes of this motion, plaintiffs have stated claims against Sheriff Hilton in both his official and individual

capacities for violations of their Fourth Amendment rights.

Accordingly, defendants are not entitled to qualified immunity in their individual capacities. Defendants' motion to dismiss plaintiffs' Fourth Amendment claims should be denied as to the claims against defendants in their individual capacities and as to the claims against Sheriff Hilton in his official capacity. Defendants' motion to dismiss plaintiffs' Fourth Amendment claims should be granted as to defendants Slocum Doyle, LaCour, and Rauls in their official capacities.

## Excessive Force

Defendants also move to dismiss plaintiffs' claims for use of excessive force. However, plaintiffs' claims for "excessive force" primarily relate to the style in which the so-called "administrative search" was carried out. Although plaintiff Frost was "chased and thrown to the ground" and "manhandled," and Erica Doublet was handcuffed too tightly, no physical injuries have been alleged, and plaintiffs have not asked for damages due to physical injuries.

To state a claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need, and the excessiveness of which was (3) objectively unreasonable. Ikerd v. Blair, 101 F.3d 430, 433-34 (5th Cir. 1996). The injury must be more than a de minimis injury and

must be evaluated in the context in which the force was deployed. Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001); Williams v. Bramer, 180 F.3d 699, 703-704 (5th Cir.), clarified on rehearing, 186 F.3d 633 (5th Cir. 1999).

Since plaintiffs have not alleged the use of excessive force which caused an injury, and have not asked for damages for the use of excessive force, it does not appear that plaintiffs intended to state a claim for use of excessive force. Therefore, defendants' motion to dismiss plaintiffs excessive force claims should be denied as moot.

False Arrests

Defendants contend plaintiffs' claims for false arrest should be dismissed. Only three of the plaintiffs were arrested, taken in and charged - Dar Doublet, Lyle Doublet, and Erica Doublet.[5]

If success for the plaintiff in a Section 1983 suit would challenge the constitutionality of a conviction and the plaintiff cannot show that the conviction has been reversed, expunged, invalidated, or called into question by the issuance of a habeas writ, the district court may properly dismiss the Section 1983 claim. Mackey v. Dickson, 47 F.3d 744, 746 (5th Cir. 1995), citing Boyd v. Biggers, 31 F.3d 279, 283 (5th Cir. 1994), applying Heck v.

---

[5] To the extent the other plaintiffs may be considered to have been arrested for the hours they were detained by the defendants at Club Retro before they were released, those claims are adequately covered under the Fourth Amendment discussion.

Humphrey, 512 U.S. 477, 114 S.Ct. 2364 (1994).  However, if the district court decides the plaintiff's Section 1983 action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed in the absence of some other bar to the suit. Mackey, 47 F.3d at 746, citing Heck.

In the case at bar, it has not been alleged or shown that plaintiffs were convicted on any of the charges made against them by defendants.  Therefore, it appears there is no outstanding criminal judgment which would be proven invalid by a judgment in favor of plaintiffs in this case.

The constitutional torts of false arrest, unreasonable seizure, and false imprisonment require a showing that there was no probable cause.  Brown v. Lyford, 243 F.3d 185, 189 (5th Cir.), cert. den., 534 U.S. 817, 122 S.Ct. 46 (2001).  Also, Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225 (1964) (the right to be free from arrest without probable cause is a clearly established constitutional right).  An officer has probable cause to arrest if, at the time of the arrest, he had knowledge that would warrant a prudent person's belief that the person arrested had already committed or was committing a crime. See Gladden v. Roach, 864 F.2d 1196, 1199 (5th Cir.), cert. den., 491 U.S. 907, 109 S.Ct. 3192 (1989).  Also, Hunter v. Bryant, 502 U.S. 224, 228, 112 S.Ct. 534 (1991).  Therefore, the constitutional right against false arrest

40

and imprisonment was well-settled at the time of the 2006 events in Club Retro.

Louisiana state law also recognizes the tort of false arrest. Alvarado v. Poche, 2002-2 (La. App. 3d Cir. 6/5/02), 819 So.2d 1150, 1152, writ den., 2002-2212 (La. 11/8/02), 828 So.2d 1120. In order for a plaintiff to recover for false arrest, he must prove that he was unlawfully detained by the police against his will. Thus, two elements are required to prove a case in false arrest and imprisonment: (1) detention of a person, and (2) unlawfulness of the detention. Dumas v. City of New Orleans, 2001-0448 (La.App. 4 Cir. 12/05/01), 803 So.2d 1001, 1003, writ den., 2002-0024 (La. 3/15/02), 811 So.2d 912, citing Harrison v. State, Dept. of Public Safety and Corrections, 97-1086 (La. 12/1/98), 721 So.2d 458, 461; Hughes v. Gulf International, 593 So.2d 776, 780 (La. App. 4th Cir.), writ den., 595 So.2d 658 (La. 1992).

Dar and Lyle Doublet allege in their complaint that they were charged with "generic charge - charge later," "firearm possession/bar," and "failure comply fire marshal." The complaint further states that, although the Fire Marshall estimated there were 822 people in the club at the time of the raid and defendant Rauls told the press there were 1000 people in the club, plaintiffs contend there were only about 500 people present. During the raid, the Louisiana Office of Alcohol and Tobacco Control ("LaATC") videoed the counting of the money in the cash registers.

41

Plaintiffs contend that video shows the amount of money paid for entry fees, which indicates there were no more than 500 people in the club.  Finally, plaintiffs show La.R.S. 14:95.5 makes it legal for club owners to possess a firearm in a night club.  Thus, Dar and Lyle Doublet contend their arrests were unconstitutional.

Erica Doublet was charged with "improper supervision of a minor" under La.R.S. 14:92.2 and possession of a firearm in a bar.  Plaintiffs contend Erica Doublet did not commit any of the activities set forth in La.R.S. 14:92.2, and that it was legal for her to possess a firearm in the bar, under La.R.S. 14:95.5.

La.R.S. 14:95.5, Possession of firearm on premises of alcoholic beverage outlet, states:

> A. No person shall intentionally possess a firearm while on the premises of an alcoholic beverage outlet.
> B. "Alcoholic beverage outlet" as used herein means any commercial establishment in which alcoholic beverages of either high or low alcoholic content are sold in individual servings for consumption on the premises, whether or not such sales are a primary or incidental purpose of the business of the establishment.
> C. The provisions of this Section shall not apply to the owner or lessee of an alcoholic beverage outlet, or to an employee of such owner or lessee, or to a law enforcement officer or other person vested with law enforcement authority acting in the performance of his official duties.
> D. Whoever violates the provisions of this Section shall be fined not more than five hundred dollars or imprisoned for not more than six months, or both.

As pointed out by plaintiffs, La.R.S. 14:95.5 very plainly states that the owners/lessee of a nightclub and their employees are entitled to possess a firearm on the premises.  Therefore, plaintiffs could not legally be arrested for doing something they

clearly had a legal right to do.

Next, plaintiffs complain they were charged with remaining open after 2 a.m., in violation of La.R.S. 33:1236 and Rapides Parish Ordinance 4-3(a)(3)(a).

La.R.S. 33:1236, Powers of parish governing authorities, states in pertinent part:

> The police juries and other parish governing authorities shall have the following powers:...
> (6) To regulate the policing of taverns and houses of public entertainment and shops for retailing liquors in their respective parishes, and to impose whatever parish tax they may see fit on all keepers of billard tables and grog shops and on all hawkers, peddlers and trading boats.

 The power to regulate the police of a tavern is not merely to adopt a regulation, but also to enforce the regulation after it is adopted. Carnes v. Police Jury of Parish of Red River, 110 La. 1011, 35 So. 267 (1903).  It is established that, under the police power of the state, the sale of liquor may be prohibited on Sunday for the preservation of public order.  State v. Trahan, 214 La. 100, 36 So.2d 652 (La. 1948), citing State v. Bott, 31 La. Ann. 663, 1879 WL 7276 (La. 1879).

However, in this case, plaintiffs were charged with remaining open after 2:00 a.m., not with the sale of liquor after 2:00 a.m. La.R.S. 51:191, Sunday closing law, local ordinances, election, states: "Except as provided in R.S. 51:193 [relating to car dealers], the governing authority of any parish or municipality may adopt ordinances regulating or prohibiting the opening of certain

businesses and/or the sale of certain stock or articles of merchandise on Sunday, if approved by the voters at an election called as provided in Chapter 6-B of Title 18 of the Louisiana Revised Statutes of 1950.   Likewise, La.R.S. 26:493, Local regulatory ordinances, states:

> Except as limited by the provisions of this Chapter the various subdivisions of the state may regulate but not prohibit, except by referendum vote as provided by Chapter 3 of this Title or by legally authorized zoning laws of municipalities, the business of wholesaling, retailing, and dealing in alcoholic beverages. No parish or municipality shall, in the exercise of its police power, regulate the business of selling such beverages more than is necessary for the protection of the public health, morals, safety, and peace. Local subdivisions, in adopting these regulatory ordinances, may provide, in addition to the ordinary penalties authorized by law for their violation, provisions which subject the permittee to having his permit suspended or revoked in the manner provided by law for the suspension or revocation of permits.

Defendants have provided the court with copies of pertinent Rapides parish ordinances.   Section 4-3 of Ordinance of 6-14-94 states that all "saloons, bars, and lounges within the Parish of Rapides and outside the corporate limits of incorporated villages, towns, and cities shall be closed from 2:00 a.m. until 12:00 midnight on Sunday night."

Plaintiffs contend they had verbal permission from the Rapides Parish District Attorney's office to remain open after 2:00 a.m., as long as they were not selling alcohol.   Plaintiffs also argue that the "Sunday closing" ordinance was not approved by the voters as required by La.R.S. 26:493 and therefore is invalid.

In 1986 the Louisiana Legislature completely revamped the Sunday closing laws and repealed the old "Blue Laws."  In their place the Legislature enacted a form of local option.  La.R.S. 51:101 provides: "Except as provided in R.S. 51:193, the governing authority of any parish or municipality may adopt ordinances regulating or prohibiting the opening of certain businesses and/or sale of certain stock or articles of merchandise on Sunday, if approved by the voters at an election called as provided in Chapter 6-8 of Title 18 of the Louisiana Revised Statutes of 1950."[6] Bebop's Ice House, Inc. v. City of Sulphur, 2000-602 (La. App. 3d Cir. 12/6/00), 774 So.2d 369, 372.  Accordingly, a local government may prohibit taverns from opening on Sunday only if the ordinance is approved by the voters in an election.[7]  See Bebop's Ice House, Inc., 774 So.2d at 372.  Also, City of Zwolle v. Polk, 93-1102 (La.App.3d Cir. 9/14/94), 643 So.2d 201, writ den., 94-2553 (La. 1/13/95), 648 So.2d 1339.  See also, Liberto v. Rapides Parish Police Jury, 95-456 (La. App. 3d Cir. 11/2/95), 667 So.2d 552

---

[6] La.R.S. 51:193 mandates that all car dealers must be closed on Sunday.

[7] There is an exception to this rule for municipalities with a pre-existing home rule charter; that is, the home rule charter must have been created prior to the adoption fo the Louisiana Constitution in 1974.  Daiquiri Café Sherwood Inc. v. Parish of East Baton Rouge, 2000-1745 (La. App. 1st Cir. 11.9/01) 818 So.2d 1.  Since Alexandria's home rule charter was adopted in 1977, it does not fall within the exception to the election requirement.  Bryant v. City of Alexandria, 2006-1439 (La. App. 3d Cir. 4/25/07), 956 So.2d 94; Randolph v. Alexandria Civil Serv. Comm'n., 2004-1620 (La.App. 3d Cir. 4/6/05), 899 So.2d 857.

(indicating the Rapides Parish Police Jury, rather than the voters, enacted the Sunday closing ordinance in Rapides Parish).

Defendants have not addressed or refuted the argument that the Sunday closing ordinance is invalid because it was not passed in an election.[8]

Assuming plaintiffs' factual allegations are true for purposes of the motion to dismiss, plaintiffs have clearly stated both federal and state law claims for false arrest against Slocum in his individual capacity due to Slocum's preparation of the affidavits for Dar and Lyle Doublets' arrests, and ordering Erica Doublet's arrest.  Plaintiffs have also stated federal and state law claims for false arrest against Doyle in his individual capacity for his participation in their arrests and charging of plaintiffs. Therefore, Slocum and Doyle are not entitled to qualified immunity in their individual capacities as to these claims.

However, plaintiffs have not stated claims against LaCour, Rauls, or Sheriff Hilton in their individual capacities for false arrest since they have not alleged those defendants were actually involved in arresting and charging the Doublets.  Therefore, LaCour, Rauls and Hilton are entitled to qualified immunity in their individual capacities on these claims.

Finally, plaintiffs have not stated claims against LaCour,

_____

[8] Pursuant to its own terms, the comprehensive new ordinance was to become effective on January 1, 1995."

Rauls, Slocum or Doyle in their official capacities since they do not have policy-making authority for the Rapides Parish Law Enforcement District, and have not stated a claim against Sheriff Hilton in his official capacity since they have not alleged an official custom or policy for making false arrests which was promulgated or implemented by Sheriff Hilton.

Therefore, defendants' motion to dismiss plaintiffs' claim for false arrest should be denied as to Slocum and Doyle in their individual capacities, granted as to Sheriff Hilton, LaCour and Rauls in their individual capacities, and granted as to all defendants in their official capacities.

Equal Protection and Threats

Plaintiffs also claim defendants racially discriminated against them because Dar and Lyle Doublet are Creole,[9] Lyle

_____

[9] What the Doublets mean by this self-description is not clear. The meaning of "Creole" is varied and depends on the location and context in which it is used.  In late eighteenth century New Orleans, Creole described a combination of French and Spanish heritage.  Lyle Saxon, [A Biography of] Lafitte the Pirate, (1930), p. 21.  In the Isle de Brevelle Creole colony of Natchitoches Parish's Cane River country, Creoles claim French, Spanish, Indian and African heritage, a heritage often termed "Creoles of color" both in Natchitoches and in New Orleans.  Gary B. Mills, The Forgotten People, Cane River=s Creoles of Color, (1977), pp.xiii, xxv.  A sampling of the varied definitions is contained in the following excerpt from The Forgotten People, where author Mills explains:

> "While the issue of terminology is being discussed, it should be noted that considerable disagreement exists regarding the exact definition of the term *Creole* and the elements of Louisiana society to which this term should be applied. In this study, the term is used to signify any person born in the colony of French or

Doublet's wife, Erica, is Caucasian, and Club Retro was frequented by other mixed race couples.  Plaintiffs allege that, although Club Retro was raided by the Sheriff, another nearby night club with primarily white patrons had not been similarly targeted and raided by the Sheriff.

The Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike.  Brennan v. Stewart, 834 F.2d 1248, 1257 (5th Cir. 1988), citing City of Cleburne, Tx. V. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249 (1985).  A deprivation of liberty or property is not required to prove a violation of the Equal Protection Clause.  A violation of equal protection occurs only when the government treats someone differently than others similarly situated; if the challenged government action does not appear to classify or distinguish

---

Spanish descent (with the sole exclusion of the Acadian exiles, popularly called Cajuns, who settled in south Louisiana and maintained a distinct ethnic identity). *Creole* will not be limited herein to Louisianians of pure-white descent, to the wealthy aristocracy of the state, or to the residents of the New Orleans-Baton Rouge area exclusively, as has often been the restrictive usage."

Id. p. xix.  See also www.frenchcreoles.com, www.creolehistory.com, The Louisiana Creole Heritage Center at Northwestern State University in Natchitoches (www.nsula.edu/creole/); The American Heritage® Dictionary of the English Language, Fourth Edition (Houghton Mifflin Co., 2004), *available at* Dictionary.com, http://dictionary.reference.com/browse/creole.

_____The term also has specific meaning in Latin American countries and in the West Indies.  Books describing the meaning of "Creole" are too numerous to list.

48

between two or more relevant persons or groups, then the action - even if irrational - does not deny them equal protection of the laws.  <u>Brennan</u>, 834 F.2d at 1257.

To state a claim of racial discrimination under the Equal Protection Clause, a plaintiff must allege that the government treats him differently than others similarly situated, prove that the governmental official was motivated by intentional discrimination on the basis of race, and demonstrate intentional discrimination.  <u>Coleman v. Houston Independent School Dist.</u>. 113 F.3d 528, 533 (5th Cir. 1997).  Invidious discriminatory animus is the sine qua non of a constitutional claim of racial discrimination.  <u>Coleman</u>, 113 F.3d at 534.  The discriminatory intent of one official my not be imputed to another for purposes of imposing individual liability under the civil rights laws.  Only the direct acts of omissions of government officials, not the acts of subordinates, will give rise to individual liability under Section 1983.  <u>Coleman</u>, 113 F.3d at 534.  Therefore, the law as to Equal Protection rights was well-settled in this circuit at the time of the 2006 events in Club Retro.

Plaintiffs also allege they were subjected to verbal abuse which caused mental anguish and emotional distress.  Verbal abuse, standing alone, does not amount to a separate and independent constitutional violation.  However, racial epithets that accompany harassment or some other violation of constitutional rights may

49

amount to a separate equal protection violation.   Williams v. Kaufman Cty., 352 F.3d 994, 1012 (5th Cir. 2003), citing Williams v. Bramer, 180 F.3d 699, 706 (5th Cir.), clarified on rehearing, 186 F.3d 633 (5th Cir. 1999).  The use of a racial epithet is strong evidence that a comment or action is racially motivated.  The question in the equal protection context, however, is not just whether the conduct is racially motivated, but also whether that action deprives a person of equal protection of the laws.  Where the conduct at issue consists solely of speech, there is no equal protection violation.  Williams, 180 F.3d at 706.  Also, Martin v. City of San Antonio, 2006 WL 2062283 (W.D.Tex. 2006).

Plaintiffs contend all defendants except Doyle participated in planning Operation Retro-Fit, and allege a discriminatory purpose for doing so.  Assuming, as I must, that plaintiffs' allegations of racially motivated harassment are true for purposes of the motion to dismiss, plaintiffs have stated Equal Protection claims against Sheriff Hilton, Slocum, Rauls and LaCour in their individual capacities, for a reasonable officer would have known such conduct violates the constitution.  Sheriff Hilton, Slocum, Rauls and LaCour are not entitled to qualified immunity in their individual capacities for the Equal Protection claims.

However, since plaintiffs have not alleged an official policy or custom promulgated or implemented by Sheriff Hilton for racially discriminatory searches and arrests, they have not stated an Equal

Protection claim against Sheriff Hilton in his official capacity. As above, since Rauls, Slocum and LaCour do not have the authority to make policy for the Rapides Parish Law Enforcement District, plaintiffs have not stated a claim against them in their official capacities.

Therefore, defendants' motion to dismiss should be denied as to plaintiffs' Equal Protection claims against Sheriff Hilton, Rauls, Slocum, and LaCour in their individual capacities and granted as to Doyle in his individual capacity. Defendants' motion to dismiss the Equal Protection claims should be granted as to all defendants in their official capacities.

First Amendment

Plaintiffs, including Club Retro, L.L.C., claim defendants infringed their First Amendment right to gather, associate and express themselves at Club Retro.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I.   Although freedom of expressive association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition. Healy v. James, 408 U.S. 169, 181, 92 S.Ct. 2338 (1972).

The First Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, prohibits a state, as sovereign, from abridging an individual's right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends, Boys Scouts of America v. Dale, 530 U.S. 640, 647, 120 S.Ct. 2446 (2000), and from denying an individual citizen rights and privileges solely because of his association with an unpopular organization.

There are two different sorts of "freedom of association" protected by the United States Constitution: (1) choices to enter into and maintain certain intimate human relationships are secured against undue intrusion by the state and receive protection as a fundamental element of personal liberty, and (2) a right to associate for the purpose of engaging in those activities protected by the First Amendment - speech, assembly, petition for the redress of grievances, and the exercise of religion. City of Dallas v. Stanglin, 490 U.S. 19, 23, 109 S.Ct. 1591, 1594 (1989), citing Roberts v. United States Jaycees, 468 U.S. 609, 103 S.Ct. 3244 (1984). The right of private association protects the choice of individuals and organizations to enter into and maintain certain intimate human relationships against undue intrusion by the States. Louisiana Debating and Literary Ass'n v. City of New Orleans, 42 F.3d 1483 (5th Cir.), cert. den., 515 U.S. 1145, 115 S.Ct. 2583 (1995).

The personal associations that are entitled to constitutional protection are those that are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship; these types of relationships, such as family relationships, are distinctively personal aspects of one's life.  Conversely, an association lacking these qualities, such as a large business enterprise, is remote from the concerns giving rise to this constitutional protection.  Roberts, 468 U.S. at 619, 104 S.Ct. at 3250-3251.

In Stanglin, the Supreme Court held that dance hall patrons are not engaged in the sort of "intimate human relationships" referred to in Roberts, and do not engage in a form of expressive activity protected the First Amendment.  The Supreme Court explained that the dance hall patrons were not members of any organized association, but instead were simply patrons of the same business establishment, most were strangers to one another, and anyone willing to pay the admission fee was admitted.  Although "freedom of speech" means more than simply the right to talk and to write, it is possible to find some kernel of expression in almost every activity a person undertakes, but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.  Therefore, the court held that the activity of dance-hall patrons coming together to engage in recreational dancing is

not protected by the First Amendment since that activity does not qualify as either a form of "intimate expression" or a form of "expressive association." Stanglin, 490 U.S. 24-25, 109 S.Ct. 1594-1595.

Plaintiffs allege that the intimidating tactics used during the raid, and the presence of Rapides Parish Sheriffs Deputies during a concert event one week after the raid, both inside the club and in the parking lot, intimidated and discouraged people from entering Club Retro, interfering with the plaintiffs' rights to freedom of expressive association.  However, since owning, operating, patronizing, working for, or existing as a business establishment such as Club Retro is not an activity protected by the First Amendment, plaintiffs' rights to expressive association were not violated.

Therefore, plaintiffs have not stated a claim for violation of their constitutional rights under the First Amendment and defendants' motion to dismiss plaintiffs' First Amendment claims should be granted.

Interference with Family Integrity

Plaintiffs allege a state law claim for interference with family integrity, or relations, because defendants wanted to have plaintiffs' children removed from their custody.  Plaintiffs admit that the social worker who accompanied the officers refused defendant Slocum's request to take plaintiffs' children away from

54

them.

The right to family integrity is a substantive due-process right.  Morris v. Dearborne, 181 F.3d 657, 667 (5th Cir. 1999), citing Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208 (1972). The Constitution protects family relationships and a parent's right to the care, custody, control, and management of their children is well-established.  The most essential basic aspect of familial privacy is the right of the family to remain together without the coercive interference of the awesome power of the State.  Wooley v. City of Baton Rouge, 211 F.3d 913, 920 (5th Cir. 2000), and cases cited therein.  The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment.  Stanley, 405 U.S. at 651, 92 S.Ct. at 1213.  In evaluating an alleged violation of a substantive due process right, the threshold question if whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.  If this standard is met, a court must next determine whether there exist historical examples of recognition of the claimed liberty protection at some appropriate level of specificity.  Morris, 181 F.3d at 668, and cases cited therein.  Supreme Court jurisprudence establishing the right of family integrity has been formulated in the context of state attempts to permanently terminate parental rights.

Hodorowski v. Ray, 844 F.2d 1210, 1217, citing Santowsky v. Kramer, 455 U.S. 745, 747-48, 102 S.Ct. 1388 (1982), and Stanley, 405 U.S. at 649, 92 S.Ct. 1208.  Also, Wooley v. City of Baton Rouge, 211 F.3d 913 (5th Cir. 2000); Kiser v. Garrett, 67 F.3d 1166 (5th Cir. 1995); Martin v. Texas Dept. of Protective and Regulatory Serv., 405 F.Supp.2d 775, 787 (S.D.Tex. 2005).  In Martin, the court found no violation of the right to family integrity where the child's teacher, suspecting the child had been abused, called Child Protective Services three times, an investigation was conducted, abuse was confirmed, and the child was temporarily removed from her parents' custody prior to a hearing being held, concluding these actions did not shock the conscience.  The court in Martin further found that negligence and insensitivity are not a sufficient basis for the substantive due-process claim of interference with family relations.

In the case at bar, plaintiffs contend Slocum tried to get the social worker who accompanied the officers on the raid to take plaintiffs' children into state custody, but the social worker refused to do so.  Apparently Deputy Slocum did not, himself, have the power to remove the children from plaintiffs' care and custody.  Since plaintiffs admit their children were *not* removed from their care by the social worker whom Deputy Slocum had enlisted, plaintiffs have not alleged or shown the integrity of their family was actually violated.  They have not alleged anything more than a

threat by someone who did not have the power to take custody of their children.  The case law finding violations of the right to family integrity involve attempts by the state to remove the children permanently.  Even accepting plaintiffs allegations as true for purposes of this motion, this case simply does not come close to any "historical examples of recognition of the claimed liberty protection at some appropriate level of specificity."

Since there is no clearly established constitutional right to family integrity which protects plaintiffs from a threat to remove their children from their custody, made by an officer who did not have the power to do so himself, plaintiffs have not stated a substantive due process claim for violation of their right to family integrity.  Therefore, defendants are entitled to qualified immunity on plaintiffs' right to family integrity claim and their motion to dismiss should be granted as to this claim.

Interference with Business

Plaintiffs allege defendants intentionally and unreasonably interfered with their business.  Plaintiffs allege that defendants' actions discouraged people from going to Club Retro, causing loss of business and eventually resulting in the closure of Club Retro.

If the court eventually finds the defendants violated the Fourth Amendment or Equal Protection rights of the owners, employees, and patrons of Club Retro, whether those violations caused a loss of business for Club Retro and its owners is an

element of damages.  See <u>Mendoza v. I.N.S.</u>, 559 F.Supp. 842, 849 (D.C.Tex. 1982)(bar owners cannot directly complain that their patrons' Fourth Amendment rights were violated, but they may complain when such violation caused the owners direct harm, such as unreasonable interference with business).  Since plaintiffs stated claims under the Fourth Amendment and Equal Protection Clauses, defendants' motion to dismiss plaintiffs' claim for damages for loss of business should be denied.

<u>Defamation and Fifth Amendment Claims</u>

Plaintiffs state in their brief that they withdraw all Fifth Amendment claims and state law defamation claims against defendants and, therefore, do not oppose defendants' motion to dismiss these claims.  Therefore, defendants' motion to dismiss plaintiffs' Fifth Amendment claims and defamation claims should  be granted.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that defendants' motion to dismiss be GRANTED and that all claims against defendants Slocum, Rauls, Doyle, and LaCour in their official capacities be DISMISSED WITH PREJUDICE.

IT IS FURTHER RECOMMENDED that defendants' motion to dismiss plaintiffs' Fourth Amendment claims be DENIED as to Sheriff Hilton in his official capacity, GRANTED as to all other defendants in their official capacities, and DENIED as to all defendants in their individual capacities.

IT IS FURTHER ORDERED that defendants' motion to dismiss plaintiffs' excessive force claims be DENIED AS MOOT.

IT IS FURTHER RECOMMENDED that defendants' motion to dismiss the state and federal law claims for false arrest be DENIED as to defendants Slocum and Doyle in their individual capacities, GRANTED as to defendants Rauls, LaCour, and Sheriff Hilton in their individual capacities, and GRANTED as to all defendants' in their official capacities.

IT IS FURTHER RECOMMENDED that defendants' motion to dismiss plaintiffs' Equal Protection claims be DENIED as to Sheriff Hilton, Rauls, Slocum, and LaCour in their individual capacities, GRANTED as to Doyle in his individual capacity, and GRANTED as to all defendants in their official capacities.

IT IS FURTHER RECOMMENDED that defendants' motion to dismiss plaintiffs' First Amendment claims be GRANTED.

IT IS FURTHER RECOMMENDED that defendants' motions for qualified immunity and to dismiss plaintiffs' claims for violation of their substantive due process right to family integrity be GRANTED.

IT IS FURTHER RECOMMENDED that defendants' motion to dismiss plaintiffs' claims for interference with business be DENIED.

IT IS FURTHER RECOMMENDED that defendants' motion to dismiss plaintiffs' Fifth Amendment and defamation claims be GRANTED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and

Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 4th day of April, 2008.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

\*

60